**SALLEE, Appellee,**

**v.**

**SALLEE, Appellant.**

[Cite as *Sallee v. Sallee* (2001), 142 Ohio App.3d 366.]

Court of Appeals of Ohio,
Twelfth District, Warren County.

No. CA2000–05–047.

Decided April 23, 2001.

*Kathy H. Kearin,* for appellee.

*Rittgers & Rittgers, W. Andrew Hasselbach* and *Ellen B. Rittgers,* for appellant.

---

VALEN, Presiding Judge.

Defendant-appellant Jeffery W. Sallee appeals a decision of the Warren County Court of Common Pleas, Domestic Relations Division, granting a motion for change of custody filed by plaintiff-appellee Teresa A. Sallee ("Sallee"). We affirm the judgment of the trial court.

The parties have three minor children, Daniel (born October 20, 1987), Matthew (born April 23, 1989), and Amanda (born October 15, 1992). By divorce decree filed August 3, 1998, the trial court terminated the parties' marriage and designated appellant as the residential parent and legal custodian of the children. In the original decree, in determining the children's best interest for custody purposes, the trial court found, *inter alia*:

"d. [T]he youngest boy, Matthew, has a learning disability. The Kings Local System has prepared an individual education plan which seems to be needing [*sic*] his needs. * * * Father, however, has been significantly more involved in meeting with * * * the principal concerning the boys' schooling than has mother. * * * [F]ather has been more concerned about the boys' schooling than * * * mother.

"* * *

"h. Husband has been convicted of prior assaultive behavior against his own brother. He has in the past had a drinking problem as evidenced by a D.U.I. conviction in 1995 and one in 1987. Wife initiated a domestic violence petition [in] 1997 * * *. The Court finds that husband, in fact, has had problems controlling his temper. * * * Unquestionably, he has been violent towards wife. However, there is absolutely no evidence that he has been violent towards the children. * * * He further claims that he has stopped drinking.

"* * *

"j. [T]he wife is seriously considering relocating the children to the State of Kentucky. As noted above, she has no family in this area [Ohio] and no strong ties to the area. She is involved in a serious relationship which may lead to marriage * * *.

"* * * [T]he Court finds that it is in these children's best interest to designate their father as their residential parent. The father has the support of his mother as a back up for daycare purposes. Wife has placed her own wants ahead of what is truly best for the children. She has begun a relationship with another man before this divorce has ended. She would uproot the children and relocate them to Kentucky without any serious concerns as to the impact upon them. * * *

"While he undoubtedly was a very poor husband, the Court finds that he is quite likely a very good father. Father has specifically focused on the educational needs of the children. * * *"

On February 25, 1999, Sallee moved the trial court for a modification of custody and parental rights. The magistrate held a hearing on Sallee's motion on June 7, 1999. At the hearing, it was established that (1) during the 1998 initial custody hearing, appellant had a pending DUI charge, which he failed to disclose

to the trial court; (2) when convicted of that DUI, appellant was sentenced to five days in jail and to an eighteen-day house incarceration and his driver's license was suspended for one year; (3) appellant was cited for pedestrian intoxication on a highway in January 1999; (4) appellant admitted drinking at his sister's birthday and at his own birthday in the spring of 1999; (5) in April 1999, while caring for and in the presence of his children and two of their friends, appellant was angrily confronted by a friend's wife after she found both her husband and appellant drunk in appellant's bedroom with appellant undressed to his underwear; (6) police cited three young men for possession of marijuana and drug paraphernalia in the adjacent apartment rented by appellant to his nephew; (7) both Matthew and Amanda, while in appellant's custody, had a record of excessive tardiness and absences at school even though they live across the street from the school; and (8) third-grader Matthew failed to turn in his homework on a regular basis.

By decision filed September 30, 1999, the magistrate found a change of circumstances in the children and appellant, but concluded it was in the children's best interest to remain in appellant's custody. Sallee filed objections to the magistrate's decision. On November 15, 1999, the trial court held a hearing on Sallee's objections during which the parties testified. By entry filed December 6, 1999, the trial court sustained Sallee's objections, and ordered that custody of the children be awarded to Sallee and appellant be given visitation. Appellant appeals and asserts one assignment of error:

"The trial court abused its discretion and erred in overruling the magistrate's decision and in granting appellee a change of custody."

In his sole assignment of error, appellant argues that there was no credible or competent evidence to support the trial court's findings that it was in the children's best interest to grant Sallee's motion for change of custody, and that the advantages of a change of custody outweighed any harm likely to result from the change of custody.

A trial court has broad discretion in custody proceedings and its judgment will not be reversed absent an abuse of discretion. *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 674 N.E.2d 1159, paragraph one of the syllabus. Because "custody issues are some of the most difficult and agonizing decisions a trial judge must make[,] * * * a trial judge must have wide latitude in considering all the evidence before him or her * * * and such a decision must not be reversed absent an abuse of discretion." *Id.* at 418, 674 N.E.2d at 1162. Abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

In reviewing a custody determination, an appellate court must "review the record to determine whether there is any evidence in support of the prevailing party." *Ross v. Ross* (1980), 64 Ohio St.2d 203, 206, 18 O.O.3d 414, 416, 414 N.E.2d 426, 429. While reviewing the record, the appellate court must keep in mind that the trial court is better equipped to examine and weigh the evidence and to make decisions concerning custody, *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849 because " '[t]he knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by the printed record.' " *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178, 180, quoting *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13, 47 O.O. 481, 483, 106 N.E.2d 772, 774.

R.C. 3109.04(E)(1)(a) governs the modification of a previous order allocating parental rights and responsibilities (f.k.a. custody order) and states:

"The court shall not modify a prior decree allocating parental rights and responsibilities * * * unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, his residential parent, * * * and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * *, unless a modification is in the best interest of the child and one of the following applies:

"* * *

"(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."

Therefore, the trial court may modify parental rights and responsibilities only if it finds that (1) there has been a change of circumstances, (2) a modification is in the best interest of the child, and (3) any harm likely to result from a change of environment is outweighed by the advantages of the change. R.C. 3109.04(E)(1)(a)(iii). In determining whether the modification of a previous custody decree is in the best interest of the child, the trial court must consider all relevant factors, including those set forth in R.C. 3109.04(F)(1).[1]

---

1. R.C. 3109.04(F)(1) provides that in determining the best interest of a child on a modification of a custody decree, the trial court must consider the following factors:
   "(a) The wishes of the child's parents regarding his care;
   "(b) If the court has interviewed the child in chambers * * *, the wishes and concerns of the child, as expressed to the court;
   "(c) The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest;
   "(d) The child's adjustment to his home, school, and community;

Appellant is not disputing that his "drinking problem and DUI conviction, with its attendant driver's license suspension, create[d] a change of circumstances[.]" We therefore need not address this threshold finding. Rather, appellant challenges the trial court's findings that granting custody of the children to Sallee was in the children's best interest and that the advantages of a change of custody outweighed any harm likely to result from the change of custody.

■ In its decision granting Sallee's motion for change of custody, the trial court commented on appellant's alcoholism and the children's record of excessive tardiness and absences at school. The court found that while appellant had "convinced the Court that his drinking problems were under control and at an end during the original divorce trial," the record sadly showed otherwise. The court also found that appellant's parental skills were "woefully lacking" as evidenced by his "dismal record of * * * not getting the children to school at all or on time[.]" The court further found that "while father certainly means well and undoubtedly has tried hard to be a good father, he simply lacks the necessary skills to do so. His primary effort seems to be that of being a friend to the children rather than a parent. * * *

"* * * Certainly this Court remains troubled by mother's choice to move away from the children's extended family in Ohio so that she could be with her boyfriend in rural southern Kentucky. That factor tipped the balance of the Decision in the original granting of custody * * *. Thus, the Court is faced with the difficult task of weighing whether or not father's drinking and failure to deliver the children to school on time and allowing them to partake in activities that are not age appropriate, is worse than mother's removal of them from their extended family. Neither parent is willing to or able to place the children's needs ahead of their own wants and needs.

"* * * Here, father did not have to be a terrific parent in order to prevail. He only had to be an adequate parent. Unfortunately, his alcoholism and his lack of insight into the developmental needs of the children have prevented him from succeeding. Therefore, the Court finds that mother has met her burden of

---

"(e) The mental and physical health of all persons involved in the situation;

"(f) The parent more likely to honor and facilitate visitation * * *;

"(g) Whether either parent has failed to make all child support payments * * * that are required of that parent pursuant to a child support order * * *;

"(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;

"(i) Whether the residential parent * * * has continuously and willfully denied the other parent his or her right to visitation in accordance with an order of the court;

"(j) Whether either parent has established a residence, or is planning to establish a residence outside this state."

establishing that the harm in forcing the two boys, whose choice is to remain with their father, to move over their wishes and the other presumed harm that such a change will cause is overborne by the stability and consistency that she offers."

After thoroughly reviewing the record, we find it amply supports the trial court's decision. While appellant had claimed he had stopped drinking at the original custody hearing, appellant admitted to several drinking incidents at the hearing before the magistrate. As already noted, appellant was convicted of DUI in 1998, sentenced to five days in jail and to an eighteen-day house incarceration, and his driver's license was suspended for one year. Although appellant received occupational driving privileges during the suspension, he admitted that the suspension interfered with his participation in the children's extracurricular activities. Appellant denied lying to the trial court regarding his then-pending DUI. He explained that he simply was not asked about pending criminal cases. Appellant testified that he voluntarily completed an intensive outpatient alcohol rehabilitation program before his 1998 DUI conviction.

Despite completion of the program, appellant was cited on January 1, 1999, for pedestrian intoxication on a highway after leaving a bar. Although the bar closed at 2:30 a.m., the deputy sheriff who cited appellant testified that when he was dispatched to appellant at 6:35 a.m., the latter was still very intoxicated and had slurred speech and a very strong odor of alcohol. At the hearing before the magistrate, appellant admitted drinking at his and his sister's birthdays in the spring of 1999. Appellant testified, however, that the children were with Sallee during the foregoing incidents.

That was not the case on April 13, 1999, when appellant was angrily confronted by a friend's wife after she found both her husband and appellant drunk in appellant's bedroom with appellant undressed to his underwear. That day, David and Holly Lotz and their two children visited appellant and his children. Two friends of Daniel and Matthew were also there to spend the night. Appellant and David Lotz left to return videos and came back two hours later, drunk. Angry, Holly Lotz left but came back to take her children with her, as it "wasn't a good situation for anybody's children." When she came back, she found both men in appellant's bedroom (which was at first locked) with appellant undressed to his underwear. A friend of Daniel who was spending the night testified that he and appellant's children witnessed the commotion between the adults and that one of the two men walked out of the bedroom in his underwear. Although the incident upset the children (and appellant so testified), appellant never checked on them.

Evidence was presented that appellant's alcoholism affects the children. Sallee testified that when she confronted appellant in person about the Lotz incident, she was not allowed to take the children with her even though it was her visitation weekend. Sallee also testified that on three or four occasions, Matthew

cried when it was time for him to leave with his mother for the weekend because he was afraid appellant was going to drink. Daniel's friend testified that Matthew "gets on" his father about his drinking. A school district counselor stated that Matthew had mentioned to him that appellant "drank some." Appellant admitted that his drinking affected the children.

Appellant also admitted he was a recovering alcoholic. When asked if he was going to continue drinking, appellant replied, "I hope not." Appellant testified that he does not go to AA meetings because he does not have the time. Appellant also testified that although he was receiving "alcohol-related therapy," he had not seen his alcohol counselor in six months and had not completed a Twelve-Step program. Appellant testified that with the exception of the Lotz incident, he does not drink when he has the children.

During the 1998–1999 school year, Matthew was in third grade and Amanda was in kindergarten. During that school year, Matthew was absent 13.5 times and late thirty-four times, and Amanda was absent eighteen times and late thirty-five times, even though they live across the street from the school. Amanda's kindergarten teacher testified that at the beginning of the year, Amanda would get upset when she was late. Robin Solonto, the principal at Matthew and Amanda's elementary school, testified that the vast majority of the tardy incidents was within the five-to-ten-minute range, with some longer. Solonto testified that too many absences affect how a child does in school. Although Solonto talked to appellant several times about the children's tardiness and absences and appellant acknowledged the problem, the children continued to be late for the 1998–1999 school year. The record shows that the problem has not abated. During the first quarter of the 1999–2000 school year, Matthew was absent three times and Amanda five times. Both were late once.

Sallie Ihle, an intervention specialist and one of Matthew's teachers, testified that in third grade, Matthew failed to turn in his homework on a regular basis. Although she notified appellant several times about the problem, the result was sporadic. As a result, several of Matthew's grades declined in the second half of the school year. Appellant testified that turning in Matthew's homework was necessary but not crucial and denied it had an effect on Matthew. Appellant testified it was beyond his ability to make sure homework was done each and every night. The problem has not abated. Matthew's school report for the first quarter of the 1999–2000 school year states that Matthew needs to bring his assignments in.

Sallee testified that she was concerned about the children in general, appellant's drinking, the children's school attendance, and Matthew's grades. Sallee testified that Daniel has been in trouble at school for "lying, not paying attention, his homework," and that he has been in detention. Appellant testified that

Daniel has had motivation problems, not turning his homework in, or not giving homework a lot of effort.

The record shows that both parents are concerned and care about the children's education. It is undisputed that appellant has met with the children's teachers, principals, and counselor more often than Sallee, presumably because of the three-hour drive between Kentucky and Ohio. During the 1998–1999 school year, Sallee met with Solonto, Ihle, and Amanda's kindergarten teacher once and spoke with the school district counselor twice. Sallee testified that when she met with the teachers, she reviewed the children's progress and grade cards that she had trouble receiving. By contrast, during that same school year, appellant met with Solonto and Amanda's teacher at least twice formally and ten times informally. Appellant met with Ihle three times and spoke with the school district counselor twice. Sallee testified that she already had chosen the school the children would go to and that she had checked into the availability of special programs for Matthew, who has a learning disability.

Sallee lives with Kenneth Isaacs in his house in Kentucky and intends to live there with the children. Isaacs owns his own construction company. At the hearing before the trial court, Sallee testified that she was now engaged to Isaacs. Sallee's job situation has undisputedly been unstable: the record shows that she has regularly quit jobs and that she was unemployed for about a year between April 1998 and March/April 1999. Sallee testified that during that period, she sent about thirty applications but could not find a job with benefits (such as health insurance). At the hearing before the trial court, she testified that she had been working at a convenience store for about a couple of months. That job does not provide health insurance. Sallee testified that Isaacs helped her financially with her child support obligation while she was unemployed, and that he would willingly support her and the children should she quit her job.

Sallee testified that appellant has threatened her and Isaacs in the children's presence. Appellant has also told the children that Sallee had "abandoned them, * * * run out on them." Sallee admitted that her living in Kentucky somewhat affected her ability to exercise her visitation. Both parties testified that appellant denied Sallee a weekend visitation with Daniel because appellant intended to take his son to a Pink Floyd laser show. Although appellant originally intended for Matthew and Amanda to go with Sallee for that weekend, he ended up not allowing them to go.

The record shows that appellant has taken Daniel to a Black Sabbath concert. Appellant testified he has not taken him to other concerts because Daniel "hasn't requested to go to any others." Believing that it could improve Daniel's self-esteem and because Daniel, a skater, wanted to emulate other skaters, appellant

allowed him to bleach his dark brown hair. Appellant also allowed him to wear an earring. Appellant testified the earring was a fad and was now gone. Daniel's natural hair is regrowing and is now "two-tone." Appellant has also allowed Daniel to wear a T-shirt promoting beer. The T-shirt shows thirty bottles of beer under the saying "LIFE IS FULL OF DIFFICULT DECISIONS."

Appellant now lives with a former friend of Sallee, Michelle Byrd, and Byrd's two children in his house. Appellant testified that he loves his children, that they are his life, and that he wants to continue rearing them. Appellant also testified that the children have a very good and close relationship with his extended family. All of appellant's relatives live within a fifteen-mile radius of his house. Had it not been for his family support, appellant would not "have made it this far." Appellant testified that for the children "[t]o lose their family, the only one they've known, * * * would be catastrophic bad for them emotionally, maybe physically * * *."

After thoroughly reviewing the record in light of the factors listed in R.C. 3109.04(F)(1), we find that there was some competent evidence to support the trial court's determination. Admittedly, this was a difficult case because both parents love their children and are capable of providing a home for them. However, the trial court reviewed each party's strengths and weaknesses as a parent and concluded that it was in the children's best interest to transfer custody to Sallee, and that any harm from the change was outweighed by the advantages. We find no abuse of discretion in the trial court's decision granting Sallee's motion to modify custody. Appellant's sole assignment of error is overruled.

*Judgment affirmed.*

WALSH and POWELL, JJ., concur.