[Cite as *In re J.L.C.*, 2023-Ohio-4081.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


|                          |   |                                      |
|--------------------------|---|--------------------------------------|
| IN RE:                   | : |                                      |
|                          |   | CASE NO. CA2022-05-046               |
| J.L.C.                   | : |                                      |
|                          |   | O P I N I O N                        |
|                          | : | 11/13/2023                           |
|                          | : |                                      |
|                          | : |                                      |
|                          | : |                                      |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JS2014-0963


Michael R. Bassett, for appellant.

Rapier & Bowling Co., L.P.A., and Kyle M. Rapier, for appellee.

Jeannine C. Barbeau, guardian ad litem.


**BYRNE, J.**

{¶ 1} Mother appeals from a decision of the Butler County Court of Common Pleas,

Juvenile Division, which granted a change in custody of her son "Jonathan,"[1] a juvenile.

---

1. "Jonathan" is a pseudonym adopted in this opinion for purposes of privacy and readability. *In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn.1.

Mother previously had custody of Jonathan and was the residential parent, but the court's decision awarded custody of Jonathan to Father and made Father the residential parent. For the reasons described, we affirm the juvenile court's decision.

## I. Facts and Procedural History

{¶ 2} The record in this case is voluminous. The evidentiary hearing alone resulted in over 1,500 pages of transcribed testimony and nearly 1,500 pages of exhibits. The following summary of the key facts in this case is not intended to be comprehensive of all testimony and exhibits. However, having reviewed the record and having conducted our analysis based on the information available in the record, we believe the following summary provides the key information the reader needs to understand our analysis.

{¶ 3} Jonathan was born in April 2014. Mother and Father were not married, and their relationship had ended before Jonathan was born. Later that year, Father asked the juvenile court for shared parenting or custody, but the court granted Mother custody and Father visitation. Not long after, Father was married. More recently, Mother too was married.

{¶ 4} In 2016, when Jonathan was only a toddler, Mother began reporting to children services that, during visits, Father and especially Jonathan's half-sister "Ashley,"[2] who lived with Father, were abusing Jonathan. Mother claimed that it was Jonathan who had disclosed the abuse to her. Mother alleged that Ashley—who is only a few years older than Jonathan—was sexually abusing Jonathan, often in rather shocking ways. Mother claimed that Jonathan had made a "staggering" number of these allegations and had told her that Ashley had made him do incredibly bizarre things, like eat feces. Mother also claimed that Jonathan was acting out at home after his visits and was afraid of visiting

_____

2. Another pseudonym to protect the privacy of a minor child.

Father. Mother continued to report similar allegations over the years that followed. Many of the allegations concerned sexual abuse by Ashley, but some involved verbal or physical abuse by Father. Eventually Mother even alleged that Father's wife (Jonathan's stepmother) abused Jonathan.

{¶ 5} But several different children services agencies who were involved with the family (two in Ohio and two in Kentucky) investigated Mother's many reports of abuse and could never substantiate any of them. One agency initially determined that abuse was "indicated." But the agency later dismissed the case after finding that Jonathan appeared to have been coached by Mother. Mother stopped making abuse reports in late 2017, but a few months later the reports began again, this time coming mostly from Jonathan's therapist based on what Jonathan told her during sessions.

{¶ 6} Over the next couple of years, Mother and Father each filed several motions with the juvenile court. Relevant here are Mother's motion to modify or restrict Father's visitation, Mother's motion to modify child support, and Father's motion for a change of custody. A hearing was held before a magistrate on these motions over eight days, spread out over more than a year from August 2020 to September 2021. Many witnesses testified and many exhibits were presented. Besides Mother and Father, six witnesses in particular shed the most light on the question of who should have custody of Jonathan.

{¶ 7} The first was Dr. M. Douglas Reed, a forensic psychologist, who was appointed by the juvenile court to provide an independent evaluation of the parents. Dr. Reed separately evaluated both Mother and Father and submitted an extensive report for each. While Dr. Reed's evaluation of Father revealed little of note, the same was not true for Mother. Dr. Reed described Mother as having delusional thinking for continuing to believe Jonathan's abuse claims despite no claim ever having been substantiated. Reed also diagnosed Mother with "Other Specified Personality Disorder," which features

symptoms that cause significant distress or impairment but do not meet the criteria for a specific personality disorder. He found that Mother had mixed features of histrionic, borderline, paranoid, and narcissistic personality disorders. It was Dr. Reed's opinion that maladaptive thoughts, moods, and behaviors prevented Mother from being an effective parent. Mother, he wrote in his report, was more focused on winning her battle with Father than on protecting her child.

{¶ 8} Pamela Miller, an expert in childhood trauma and sexual abuse retained by Father, evaluated Ashley in an effort to determine the veracity of the claim that Ashley was sexually abusing Jonathan. She submitted a written report. After talking to both Ashley and Jonathan, Miller concluded that while Jonathan may have been abused by someone at some point, Father and Ashley were not the ones who committed the abuse. Miller found that Jonathan showed a pattern of fantasizing and of difficulty distinguishing between reality and fantasy. Miller also noted that Jonathan had told her that he used to lie about Ashley—particularly with regard to his statements that Ashley had touched him inappropriately—and that he was sorry for those lies. Miller concluded that Jonathan's allegations against Ashley appeared to be the product of his imagination or of coaching. Another witness, Brenda Patton, the family's reunification therapist, testified that she believed Mother had coached Jonathan to make false allegations of abuse.

{¶ 9} The guardian ad litem ("GAL") filed a report and testified at the hearing. She had met with Jonathan on several occasions and found no evidence that he had been abused by Father or Ashley. The GAL too believed that Mother had coached Jonathan to make false allegations. In her report, the GAL discussed the concept of parental alienation and the harm that such alienating behavior can have on children. She believed that Mother was trying to alienate Jonathan from Father, to Jonathan's detriment, by repeatedly making abuse reports to children services and otherwise interfering with the relationship between

Father and Jonathan. The GAL described Jonathan as having a good relationship with Father and as interacting positively with Father during visits—contrary to Mother's depiction of Jonathan as anxiety-ridden and sobbing during visits with Father. The GAL recommended that Father be given custody of Jonathan.

{¶ 10} Jonathan's therapist, Kim Rosenzweig, a clinical psychologist, testified that she believed what Jonathan said and believed that Ashley was sexually abusing him. Rosenzweig admitted, though, that she had never met, interviewed, or evaluated Ashley and based her belief solely on Jonathan's statements.

{¶ 11} Finally, Mother presented the testimony and written report of a psychologist, Dr. Ed Connor. Mother had asked Dr. Connor to review Dr. Reed's report and to perform his own psychological evaluation of Mother. Dr. Connor testified that he had serious concerns with Dr. Reed's evaluation. Dr. Connor found Mother's mental state to be quite normal and found no indication of any personality disorder. After conducting his evaluation—which he admitted was brief—it was Dr. Connor's opinion that Mother was an effective parent. He had no concerns about her emotional stability or capability to parent well.

{¶ 12} As for Mother's and Father's testimony, perhaps most pertinent was their admission that in late 2017 they had an affair. They met for sex, they exchanged sexually graphic texts and images, including nude photographs, and on a couple of occasions they got drunk together. Sometimes Jonathan was present when they were together. According to Mother, she engaged in the affair hoping that Father would leave his wife for her and Jonathan so that she could protect Jonathan from Father and Ashley. The affair ended after a few months, and Father stayed with his wife. Throughout the affair, Jonathan was seeing his therapist to receive counseling for the "abuse" that Mother had alleged was occurring in Father's home. Curiously, Mother's reports of abuse stopped during the affair

but resumed after the affair ended.

{¶ 13} In November 2021, after the change-in-custody hearing, the magistrate entered a lengthy and detailed decision recommending that the juvenile court modify its custody order and give legal custody of Jonathan and residential parent status to Father. The magistrate found Dr. Reed's and Miller's opinions more credible than those of Rozensweig and Dr. Connor. The magistrate noted that despite multiple investigations no claim of abuse had ever been substantiated and that multiple witnesses suspected that Mother had coached Jonathan to make the abuse allegations, in part because Jonathan's descriptions of the alleged abuse did not use language that a typical seven-year-old would come up with on his own. Among the magistrate's proposed orders was a requirement that the parents attend a therapeutic program to address parental alienation. After completing certain steps set forth in the order, Mother would at first have supervised visitation with Jonathan, and later visitation per the court's standard parenting order. On the issue of child support, the magistrate ended Father's support obligation and placed a support obligation on Mother, basing the amount on financial information jointly submitted by the parties.

{¶ 14} Mother filed objections to the magistrate's decision. On April 8, 2022, the juvenile court overruled Mother's objections and adopted the magistrate's decision, making only a few changes to some of the proposed orders, none of which are relevant here.

{¶ 15} Mother appealed.

## II. Analysis

{¶ 16} Mother assigns five errors to the trial court. The first two relate to the concept of parental alienation that the GAL introduced. We will address the first two assignments of error together. The third has to do with rebuttal witnesses. The fourth concerns child support. And the fifth presents a manifest-weight-of-the-evidence challenge to the decision to change custody. We will address the final three assignments of error out of the order

presented.

## A. Parental Alienation

{¶ 17} Mother's Assignment of Error No. 1 states:

{¶ 18} EVEN WERE PARENTAL ALIENATION SCIENTIFICALLY ACCEPTED, THE GUARDIAN WAS NOT QUALIFIED TO OFFER AN OPINION AS TO WHETHER THIS WAS A CASE OF IT, OR APPROPRIATE REMEDIES THEREOF.

{¶ 19} Mother's Assignment of Error No. 2 states:

{¶ 20} THE DECISION WAS FOUNDED UPON THE ERRONEOUS PREMISE THAT APPELLANT HAD ENGAGED IN PARENTAL ALIENATION, A WHOLLY INADMISSIBLE THEORY WHICH DOES NOT MEET THE EVIDENTIARY STANDARDS FOR ADMISSION.

{¶ 21} Mother contends in her first assignment of error that the GAL was not qualified as an expert to testify about parental alienation. Mother contends in her second assignment of error that the GAL's testimony about parental alienation was inadmissible because the concept is not based on reliable and scientifically valid principles.

## 1. Applicable Law and Standard of Review

{¶ 22} Evid.R. 702 governs the admissibility of expert testimony, setting out the criteria for admissibility. The basic rule is that a witness may testify as an expert about a subject beyond the knowledge of lay persons if the witness is a qualified expert and the testimony is reliable, that is, "based on reliable scientific, technical, or other specialized information." Evid.R. 702(C).

{¶ 23} Evid.R. 701, on the other hand, governs opinion testimony by lay witness. That rule states, "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of

the witness' testimony or the determination of a fact in issue."

**{¶ 24}** "Decisions regarding the admissibility of evidence are within the broad discretion of the trial court. A decision to admit or exclude evidence will be upheld absent an abuse of discretion. Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." (Citations omitted.) *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20.

### 2. Analysis

**{¶ 25}** In her appellate brief, Mother provides an extended discussion of "parental alienation syndrome," which she describes as a diagnosis proposed by child psychiatrist Richard Garner in the 1980s. She also describes the history of courts and scientific bodies rejecting that diagnosis as scientifically invalid and as "junk science." We need not grapple with that history or with the admissibility of the diagnosis under the standard for the admissibility of expert testimony under Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), because the GAL did not testify or make any recommendation regarding "parental alienation syndrome," and the magistrate and trial court likewise did not address "parental alienation syndrome."

**{¶ 26}** Mother suggests that "parental alienation" as referenced by the GAL and the juvenile court "stems from the discredited 'parental alienation syndrome.'" She points out that "there is no universal or scientific definition of parental alienation." We understand the concept of "parental alienation," which is sometimes relied on by parties in juvenile custody cases, as generally referring to a situation in which one parent attempts to damage the relationship between a child and the other parent. This can take the form of "badmouthing" the other parent, limiting access to the child, or encouraging the child to reject the other parent. The concern is that this behavior can have serious negative effects on the child

and the relationship between the parents.[3]

{¶ 27} It is true that the GAL in this case, in her report, said that she "has researched this issue [parental alienation] and is recommending that this family participate in a therapeutic intervention program to address parental alienation here." The GAL believed that Mother had tried—and would continue trying—to alienate Jonathan from Father and that Jonathan was suffering as a result.

{¶ 28} At the hearing, the GAL was asked about the discussion of parental alienation in her report. She conceded that she was not an expert and said that she was not making a diagnosis. Rather, explained the GAL, she mentioned parental alienation because she believed that a program addressing the matter could help the family. When Mother objected to this testimony on the grounds that the GAL was not an expert, the magistrate assured Mother that he would not rely on the GAL's opinion regarding parental alienation.

{¶ 29} Mother now contends that—despite the magistrate's statement to the contrary—the magistrate *did* rely on the GAL's parental alienation testimony in making the custody decision.

{¶ 30} We disagree. The GAL's testimony regarding parental alienation was not presented as expert opinion, and the magistrate explicitly said that he would not take it as such. In addition, the magistrate never made a finding of parental alienation. On the contrary, the magistrate was clearly agnostic on the matter, saying in his decision only that there "may" be parental alienation in this case. Mother is complaining about a finding that was never made and about testimony that the magistrate specifically declined to consider as expert testimony. In fact it does not appear that the GAL's testimony regarding parental

---

3. We have quoted a marriage and family therapist's explanation that the concept of parental alienation refers to a "'highly dysfunctional cross-generational alliance between the child and the triangulating parent to the disruption, dismissal and sometimes utter rejection of the child's other parent absent a bona fide protective reason.'" *Romohr v. Singer*, 12th Dist. Clinton No. CA2021-06-019, 2022-Ohio-50, ¶ 13 (quoting witness testimony).

alienation had any affect at all on the custody decision. The basis of that decision was plainly the magistrate's finding that Jonathan's allegations of abuse were likely false and that Mother's behavior was harming Jonathan. The magistrate explained:

> The conflict caused by the incessant referrals is not good for the child, it never has been, but that does not seem to limit the flow of them. Allegations of abuse against Father and his family has become a cottage industry. It is self-perpetuating. It must stop for the sake of the child.
>
> Mother is unhappy with the reports and testimony of Dr. Reed and Ms. Miller and the testimony of Brenda Patton. During the pendency of this case, Mother has filed complaints with the licensing boards of Dr. Reed, Ms. Miller and Brenda Patton.
>
> It is this magistrate's belief that as long as [Jonathan] remains in the current environment, allegations of abuse will continue unabated until Mother has eliminated Father from [Jonathan]'s life. Mother *may* be knowingly engaged in a form of parental alienation or she *may* well think the abuse is real and ongoing when it is not. It could be a combination of these. Regardless, it is not good for [Jonathan].

(Emphasis added.) It was for these reasons—which do not involve acceptance of the concept of parental alienation—that the magistrate concluded that making Father the legal custodian and residential parent was in Jonathan's best interest. The mere use of the phrase "parental alienation" by the GAL and the court does not mean the court permitted inadmissible expert testimony or improperly relied on that testimony. *See George S. v. Megan L.*, 5th Dist. Licking No. 18 CA 0020, 2018-Ohio-4088, ¶ 46-51 (affirming a determination that a change of circumstances had occurred based in part on the trial court's reasoning that "[t]he Magistrate found that the Defendant [Appellant] is committing acts which can be characterized as parental alienation, denying the Plaintiff court ordered visitation and overall failing to work with the Plaintiff such that shared parenting was no longer 'workable'").

{¶ 31} Nor does the order that Mother and Father engage in a therapeutic program

regarding parental alienation mean that the court accepted the validity of parental alienation as a scientific concept. This counseling was merely something that the court believed would help the family. *See Batty v. Batty*, 12th Dist. Butler No. CA2017-10-151, 2018-Ohio-4934, ¶ 18 (finding no problem with trial court orders that reflected the court's goal to reduce the risk of parental alienation).

{¶ 32} The juvenile court did not abuse its discretion with regard to its decisions concerning the GAL's references to parental alienation. The first and second assignments of error are overruled.

### B. Rebuttal Witnesses

{¶ 33} Mother's Assignment of Error No. 3 states:

{¶ 34} THE TRIAL COURT DENIED MOTHER'S UNCONDITIONAL RIGHT TO PRESENT REBUTTAL WITNESSES.

{¶ 35} Mother contends in the third assignment of error that she was prevented from presenting witnesses to rebut the GAL's report, particularly on the issue of parental alienation.

{¶ 36} An abuse-of-discretion standard also applies to our review of this assignment of error. *See Beard*, 106 Ohio St.3d 237, 2005-Ohio-4787, at ¶ 20. "Decisions regarding the admissibility of evidence are within the broad discretion of the trial court. * * * A decision to admit or exclude evidence will be upheld absent an abuse of discretion." *Id.*

{¶ 37} A few days before the final day of the hearing, Mother filed a motion asking the magistrate for more time to prepare for the GAL's cross-examination and for permission to call rebuttal witnesses. The GAL had just filed a report in which she mentioned the concept of parental alienation, which had never been mentioned before in the proceedings. Mother asserted that she was not prepared to respond and did not have enough time to prepare a response.

{¶ 38} At the hearing, the magistrate overruled the motion, and Mother proceeded to cross-examine the GAL. After the cross-examination, the following exchange occurred between Mother's attorney and the magistrate:

> [MOTHER'S ATTORNEY]: And just, just so that you're aware, I, I probably will follow up a motion in regards to the rebuttal witnesses I would call based upon what I've heard here but I know you've already indicated you would not grant that.
>
> BY THE COURT: Well, here's the problem we have… March is when I'm available. Do we really want this child to sit in limbo or do you want me to issue a temporary order between now and March? I mean, I'd have to, I'd have to start moving cases to try and coordinate and... three (3) lawyers and guardian's schedule.
>
> * * *
>
> BY THE COURT: Obviously, I can't keep you from filing motions…
>
> [MOTHER'S ATTORNEY]: I didn't want you to become angry when one arrives in your box.

{¶ 39} A couple of weeks after the hearing, Mother submitted a proffer of rebuttal testimony from two of Jonathan's school teachers as well as from her husband. But the bulk of the proffered testimony rebutting the GAL's report came from Jonathan's therapist, Kim Rosenzweig, who would have testified, in essence, contrary to all the GAL's recommendations.

{¶ 40} Mother fails to convince us that the magistrate abused his discretion in denying Mother's request to present this rebuttal testimony. The magistrate specifically noted in his written decision that he had reviewed and considered the proffered rebuttal testimony.[4] We note too that because Rosenzweig had already testified at the hearing, the magistrate was likely well aware of her opinions on the key matters in this case. Perhaps

---

4. The magistrate refers to the testimony of a "Dr. Strasser." We are not sure who Dr. Strasser is. That name is not in the proffered rebuttal testimony or in any other documents in the record that we have seen.

most important, though, is that despite Mother's argument in support of her third assignment of error that she needed to rebut the GAL's report and testimony on the issue of parental alienation, parental alienation is not mentioned anywhere in the proffered rebuttal testimony. Finally, as we have already noted, no finding of parental alienation was ever actually made. We see no abuse of discretion.

{¶ 41} Lastly, Mother filed a motion for supplemental briefing, citing the Fifth District's then recently issued decision in *In re R.G.M.*, 5th Dist. Muskingum Nos. CT2022-0046 and 0047, 2023-Ohio-685. Mother contended that she believed that *In re R.G.M.* may be important for our decision in the case before us, saying that a conflicting decision from us could create a conflict between the districts. We denied Mother's motion, stating that we would consider the relevance of the Fifth District's decision in this case, which we do now.

{¶ 42} In *In re R.G.M.*, the Fifth District held that the admission of a doctor's psychological report violated the mother's right to procedural due process because she did not have the opportunity to cross-examine the doctor. The appellate court relied on *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, in which the Ohio Supreme Court concluded that "[i]n a permanent custody proceeding in which the guardian ad litem's report will be a factor in the trial court's decision, parties to the proceeding have the right to cross-examine the guardian ad litem concerning the contents of the report and the basis for a custody recommendation." *Hoffman* at the syllabus.

{¶ 43} Mother did not specify in her motion how *In re R.G.M.* applies here. That case concerned the admission of a psychological report in the face of a party's inability to cross-examine the authoring doctor. Here, Mother was able to cross-exam all the witnesses. The only relevance of the case we can see is to a contention that Mother was denied the opportunity to prepare an adequate cross-examine of the GAL as to the parental-alienation concept discussed in the GAL's report. But Mother had the opportunity to cross-examine

the GAL about it.  That Mother thinks she did not have adequate time to prepare for the cross-examination is a different issue, which she did not specifically raise but to which our discussions above largely apply.

{¶ 44}  The third assignment of error is overruled.

### C. Weight of the Evidence

{¶ 45}  Mother's Assignment of Error No. 5 states:

{¶ 46}  THE DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 47}  In her fifth assignment of error, Mother argues that the trial court's decision to award custody of Jonathan to Father was against the manifest weight of the evidence.

### 1. The Law Governing Custody Modification

{¶ 48}  R.C. 3109.04 governs the modification of custody in this case.  The statute provides:

> (a) The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.  In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:
>
> > (i) The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.
> >
> > (ii) The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.

> (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

R.C. 3109.04(E)(1)(a). The circumstances described in subsections (i) and (ii) do not apply in this case. So the juvenile court in this case was permitted to modify Jonathan's residential parent and legal custodian under the statute if it made three findings: (1) that a "change has occurred in the circumstances" of Jonathan or Mother, the residential parent; (2) that the modification is in the "best interest" of Jonathan; and (3) that the advantages of the "change of environment" outweigh any likely harm from the change. R.C. 3109.04(E)(1)(a); *Forney v. Forney*, 12th Dist. Clermont No. CA2011-08-057, 2012-Ohio-3427, ¶ 23 (stating that once a court finds that there has been a change in circumstances, "the trial court can modify custody only if 'the modification is necessary to serve the best interest of the child'").

{¶ 49} In determining a child's best interest, the statute directs the court to consider all relevant factors, including these: the wishes of the parents; the interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; the child's adjustment to the child's home, school, and community; and the mental and physical health of all persons involved. R.C. 3109.04(F)(1)(a)-(j).

## 2. Standard of Review

{¶ 50} The discretion that a trial court enjoys in custody matters "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re J.M.,* 12th Dist. Warren No. CA2008-12-148, 2009-Ohio-4824, ¶ 17, quoting *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). Accordingly, "[a] juvenile court's custody decision will not be reversed absent an abuse of discretion." (Citation omitted.) *In re D.M.*, 196 Ohio App.3d 50, 2011-Ohio-3918, ¶ 25 (12th Dist.). *See also Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997) ("[A] trial

judge must have wide latitude in considering all the evidence before him or her * * * and such a decision must not be reversed absent an abuse of discretion"). "When applying the abuse-of-discretion standard, an appellate court's role is to ascertain whether the award of custody is supported by competent and credible evidence." *Id.*, citing *Flickinger.* "In reviewing a custody determination, an appellate court must 'review the record to determine whether there is any evidence in support of the prevailing party.'" *Lyle v. Kersey*, 12th Dist. Fayette No. CA99-11-031, 2000 WL 895268, *1 (Jun. 30, 2000), quoting *Ross v. Ross*, 64 Ohio St.2d 203, 206 (1980); *Romohr v. Singer,* 12th Dist. Clinton CA2021-06-019, 2022-Ohio-50, ¶ 26 (quoting the same). "No abuse of discretion will be found provided there is a substantial amount of credible and competent evidence to support the trial court's findings." *Id.*, citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23 (1990).

{¶ 51} An appellate court must review the evidence bearing in mind that the trial court is better equipped to examine and weigh the evidence and to make decisions about custody. *Sallee v. Sallee*, 142 Ohio App.3d 366, 370 (12th Dist.2001); *Miller* at 74. For this reason, deference is given to the trial court's determinations of credibility and of the appropriate weight to be given to the various best-interest factors. *See Mack v. Mack*, 12th Dist. Butler No. CA2018-09-179, 2019-Ohio-2379, ¶ 33.

{¶ 52} A final note on our review before we begin. Mother asserts as error that the custody decision was against the manifest weight of the evidence, though she argues that it constitutes an abuse of discretion. Nevertheless, we still apply the competent-and-credible-evidence test. *See Ross* at 204 ("This court does not undertake to weigh the evidence and pass upon its sufficiency but will ascertain from the record whether there is some competent evidence to sustain the findings of the trial court"). Accordingly, if the custody decision is supported by a substantial amount of credible and competent evidence, we will not reverse it as being against the weight of the evidence. *In re R.*, 12th Dist.

Madison No. CA2018-04-012, 2019-Ohio-1198, ¶ 16, citing *Flickinger* at 418.

### 3. The Magistrate's Decision

{¶ 53} As we have already noted, the record in this case is voluminous. The evidentiary hearing resulted in over 1,500 pages of testimony and almost as many exhibit pages. The magistrate evaluated all this evidence and distilled it into an over 30-page decision that the juvenile court adopted. The discussion and analysis in the decision shows that the magistrate considered all the pertinent evidence and made all the requisite statutory findings. Where the evidence was in conflict, the magistrate stated which it found more credible. Based on the credible evidence, the magistrate made all three relevant R.C. 3109.04(E)(1) change-in-custody findings—that a change in circumstances had occurred, that the change was in Jonathan's best interest, and that the advantages of the change outweighed the likely harm. And the magistrate specifically outlined the statutory best-interest factors and made findings of fact related to each of them.

### 4. Analysis of Mother's Arguments

{¶ 54} Mother's argument here does not explicitly focus on any particular statutory requirement or best interest factor. Rather, she in essence challenges the credibility of the evidence that the magistrate relied on and, implicitly, the magistrate's credibility determinations.

{¶ 55} *First*, Mother says that the evidence "clearly and overwhelmingly" shows that Jonathan suffered significant abuse in Father's home. The evidence of abuse came mostly from the testimony of Mother and Kim Rosenzweig, Jonathan's therapist. They testified that Jonathan had told them—among other things—that his half-sister Ashley had sexually abused him, and that they believed him. But there is substantial credible evidence that these abuse allegations were untrue and may have been the product of Mother's coaching. Multiple children services agencies investigated the allegations and none could substantiate

any abuse. The GAL testified that she did not believe the allegations. Jonathan had never said anything to her about abuse, nor had she seen any indication that Father or any member of his family had abused Jonathan. Rather, the GAL believed that Mother had coached Jonathan to make the allegations. In fact, Mother reported that Ashley had abused Jonathan on a day that the GAL was present in Father's home, so the GAL knew that Ashley was not home that day and could not possibly have abused Jonathan then. The family's reunification therapist, Brenda Patton, also believed that Mother had coached Jonathan to make the allegations.

{¶ 56} Perhaps most pertinent was testimony of Pamela Miller, the expert in childhood trauma and sexual abuse who had evaluated Ashley and had interviewed Jonathan. She also found little reason to credit the abuse allegations, at least to the extent those allegations concerned Father and Ashley. In her report, Miller noted that Jonathan had told her some obviously false stories and that "[t]his pattern of fantastical story-telling and seamless oscillation between truth and fantasy is consistent with [Jonathan]'s disclosures about [Ashley][.]" Indeed, wrote Miller, "[t]he most concerning part of [Jonathan]'s presentation is his trouble with memory and reality orientation, and he has some self-awareness of this." Miller noted that all Jonathan's fantastical statements were made "spontaneously," not in response to pointed questions but to "open-ended prompts" asking about himself or his family. "All of [Jonathan]'s statements about his trouble with reality, memory, and lying, combined with the fantastical story he told about his pets being systemically murdered by other children," wrote Miller, "makes clear that [Jonathan] does not know the difference between reality and unreality, truth and fantasy, or honesty and lying. He seamlessly oscillates between telling true stories and telling untrue stories." Miller noted in her report that, based on her own observations, "combined with the fact that the reunification therapist and the GAL believe Mother coached [Jonathan] to make allegations

against [Ashley], combined with the fact that Dr. Reed found Mother to be personality disordered, highly delusional, and out of touch with reality, combined with the fact that Mother never mentioned [Ashley] to Dr. Reed, combined with the science of juvenile sex offenders [which Miller had discussed earlier in her report]," led to the conclusion that "it is *more likely* that [Jonathan]'s allegations against [Ashley] are the product of coaching, fantasy, or both." (Emphasis sic.). And of course, Jonathan himself told Miller that he was sorry for having lied about Ashley in the past. Upon our review of the evidence, we conclude that Mother's argument that the evidence "clearly and overwhelmingly" shows that Jonathan suffered abuse in Father's home is incorrect. The evidence does not support such a conclusion. On the other hand, competent and credible evidence supported the juvenile court's determination that neither Father nor Ashley (nor his stepmother) abused Jonathan.

{¶ 57} *Second,* Mother says that Father presented a facade meant to (mis)lead the court into believing that he was a good parent but that the evidence showed that he was not. Mother is referring here to Father's drug and alcohol use. Father had told Dr. Reed that he had stopped using both, which Dr. Reed mentioned in his report. But Father was not entirely forthcoming with Dr. Reed. While Dr. Reed believed Father stopped using alcohol and drugs in 2012 or 2013, in fact Father tested positive for oxycodone, noroxycodone, and amphetamines in 2020, during the custody proceedings.[5] And the evidence plainly showed that Father continued to drink alcohol on at least some occasions. But the magistrate recognized that Father had lied to Dr. Reed about his drug and alcohol use and explicitly discounted Dr. Reed's (inaccurate) opinions on this matter. In fact, the magistrate ordered Father to undergo a drug and alcohol assessment and to obtain any

---

5. According to the lab technician who testified regarding Father's 2020 12-panel drug and alcohol test results, noroxycodone is the major metabolite of oxycodone. In other words, oxycodone breaks down into noroxycodone in the body.

recommended treatment. (We will return to Father's drug and alcohol use below.)

{¶ 58} *Third*, Mother argues that there was much testimony presented that when Jonathan did not have visits with Father his negative behaviors abated and he was much calmer. But once again, there was also evidence showing just the opposite. The GAL's descriptions of how Jonathan interacted with Father contrasted sharply with how Mother believed Jonathan felt during his visits with Father. Contrary to the anxiety-ridden, sobbing child depicted by Mother, the GAL said that she had seen Jonathan run into Father's arms and that they passed their time together happily. It was this evidence that the magistrate weighed more heavily.

{¶ 59} *Fourth*, Mother argues that the trial court should not have relied on many of Dr. Reed's opinions. She challenges Dr. Reed's opinions in three ways. First, she argues his opinions were flawed in that he had improperly diagnosed her with four personality disorders—histrionic, borderline, paranoid, and narcissistic. Second, Mother argues that Dr. Reed's opinions were biased against her, as he claimed that she was "delusional" because she had believed Jonathan's disclosures of abuse. And third, Mother argues that Dr. Reed betrayed an unprofessional and bizarre obsession with her appearance, suggesting that she was narcissistic because she dressed well, was a model and cheerleader, and had worked as a waitress for a Hooters restaurant. Moreover, argues Mother, Dr. Reed expressed the sexist opinion that her decision to engage in sexual activity at the age of sixteen had been the first step down a path that had led to her rape in high school and also caused him to diagnose her with borderline-personality disorder.

{¶ 60} These arguments are largely based on the opinions of Dr. Conner, the expert that Mother hired to evaluate and review Dr. Reed's evaluation. Dr. Conner concluded that Dr. Reed's personality-disorder diagnoses were improper. According to Dr. Conner, Dr. Reed merely pointed to personality traits that Mother shared with people who actually have

these disorders. Dr. Conner disagreed that Mother was "delusional" for believing Jonathan's allegations of abuse. It was his opinion that believing one's child is simply a hallmark of a good parent.

{¶ 61} But Dr. Conner's criticisms of Dr. Reed's opinions fail to engage Dr. Reed's opinions fully. After reviewing Dr. Reed's report, we find that Dr. Conner's criticisms often seem to be based on over-simplifications of Dr. Reed's opinions, to the point of distortion, as though Dr. Conner did not spend much time trying to understand them. For example, Dr. Reed did not diagnose Mother with histrionic or borderline or paranoid or narcissistic personality disorder. He diagnosed her with "Other Specified Personality Disorder," which Dr. Reed explained in his report with a quotation from the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5").[6] "This designation," Reed wrote, "'applies to presentations in which symptoms characteristic of a personality disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate, but do not meet the 'full criteria' for any specific personality disorder.'" Dr. Reed was very clear in his report and testimony that he was saying only that Mother had *features* of several personality disorders, "which doesn't mean she has that [disorder]. She has features of that, which means some part of that is, is true for her."

{¶ 62} We do agree with Mother that Dr. Reed's comments regarding her sexual history, how she dresses, her experiences as a cheerleader and model, and her work at Hooter's can appear inappropriate, or even sexist, when read in isolation. However, when questioned about these comments Dr. Reed explained that he mentioned these items in his report because they potentially related to certain psychological factors he was reviewing, and that because they were part of Mother's "history" he included them in his description of

---

6. The DSM-5 is published by the American Psychiatric Association and is "one of the basic texts used by psychiatrists and other experts." *Hall v. Florida*, 572 U.S. 701, 704, 134 S.Ct. 1986 (2014).

Mother. At trial, Reed explained that Mother's modeling, work at Hooters, and manner of dress were relevant to his "Other Specified Personality Disorder" diagnosis, which was based in part on his finding that Mother displayed characteristics of histrionic personality disorder. Dr. Reed's report, which appears to paraphrase the DSM-5, states that this disorder is characterized by "[a] pervasive pattern of emotionality and attention seeking, beginning by early adulthood." The report then lists several specific characteristic behaviors, including "[s]ome interactions are characterized by inappropriate sexually seductive or provocative behavior" and "[c]onsistently uses her physical appearance to draw attention to herself." Dr. Reed explained that Hooters models and servers are "sexually glamorized." And the way that Mother dresses is a factor, said Reed, because "[i]t draws attention." In his testimony, Dr. Reed made it clear that these are simply factors that make histrionic personality disorder a possibility. Dr. Reed also explained that none of his comments were intended to blame Mother for her experience of rape, or to suggest that because she was raped she had borderline personality disorder. Even if some of Dr. Reed's comments were questionable, we cannot conclude that the juvenile court erred as a matter of law by viewing Dr. Reed's comments in a more benign light based on Dr. Reed's defense of those comments during his testimony.

{¶ 63} It was reasonable for the magistrate to find Dr. Reed's opinions more credible than those of Dr. Conner. Dr. Reed was selected by the court to provide an independent expert opinion, while Dr. Conner was hired by Mother. Dr. Reed had Mother complete multiple psychometric tests and he conducted several other standard evaluations of her, which he summarized in a 28-page report. Dr. Conner, as the magistrate pointed out, reached his conclusions after interviewing Mother only once and after conducting only one psychometric test. Thus, finding that Dr. Reed's evaluation was very thorough, the magistrate "place[d] the appropriate weight [on] his opinions." As for Dr. Connor's

evaluation, the magistrate stated that the concluding paragraph of his relatively short written report said it all: "[Dr. Connor's] assessment of Mother was, in his own words, brief." Mother fails to convince us that the magistrate should have accepted Dr. Conner's opinions over Dr. Reed's.

{¶ 64} Although Mother thinks that the magistrate should have believed the testimony given by her witnesses, "[w]e are mindful that the 'knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record, and the reviewing court should be guided by the presumption that the trial court's findings are correct.'" *Forney*, 2012-Ohio-3427 at ¶ 28, citing *Kenney v. Kenney*, 12th Dist. Warren No. CA2003-07-078, 2004-Ohio-3912, ¶ 7; *see also Miller*, 37 Ohio St.3d at 74. Mother has not rebutted that presumption here. We see little reason to disturb the magistrate's credibility determinations or the weight that the magistrate assigned to the various statutory factors. Mother challenges the trial court's view of the evidence, but "the mere fact that the trial court chose to rely on other evidence in the record does not equate to the trial court clearly losing its way and creating a manifest miscarriage of justice." *Romohr*, 2022-Ohio-50 at ¶ 40.

{¶ 65} We pause here to note that Father—to whom the juvenile court awarded custody and designated as a residential parent—has a history of drug and alcohol abuse, and that he was not fully honest with Dr. Reed about that history. Father tested positive for oxycodone, noroxycodone, and amphetamines in 2020, as mentioned above. However, there is also evidence in the record mitigating these facts. First, Father testified that he had a prescription for Adderall, which contains amphetamine, at the time of or before his testing in 2020.[7] Father also testified that in the months before the 2020 drug test he took two

_____

7. Based on the lab technician's testimony, because the 2020 test was conducted using Father's body hair—

oxycodone pills that he obtained with a valid prescription for pain-relief medication (though Father admitted that this was an old prescription). Second, Father was tested for drugs and alcohol again later during the trial, in June 2021, and that test was negative with regard to all substances. Third, while not exculpatory of Father's more recent drug use and dishonesty with Dr. Reed, witness testimony suggests that Mother too has a history of using cocaine and abusing alcohol. And, according to Dr. Reed's report, on the Substance Abuse Subtle Screening Inventory-4 psychometric test that Reed administered to her, Mother "scored as someone with a 'High Probability' to have a Substance Use Disorder." Bottom line: neither Mother nor Father appears to be a perfect parent—far from it. But the juvenile court was aware of Father's history of abusing alcohol and drugs and nevertheless concluded that it was in Jonathan's best interest to be in Father's custody. Also, the statute governing a custody change, R.C. 3109.04, which the juvenile court applied, implicitly acknowledges that a court may award custody to a parent who, like Father, has faults. The statute provides that the juvenile court may change a child's residential parent if it finds that the change is in the child's best interest and that "[t]he harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child." R.C. 3109.04(E)(1)(a)(iii). Here, the juvenile court determined the potential harm that might come from Jonathan residing with Father was outweighed by the harm to Jonathan caused by Mother. We note too that the court also directed Father to complete an alcohol assessment and to follow up on treatment as recommended by the assessor.

{¶ 66} We conclude that the juvenile court's decision to award custody to Father was "supported by a substantial amount of credible and competent evidence," so we do not reverse that decision as being against the manifest weight of the evidence. *In re R.*, 2019-

---

rather than head hair or urine—as the tested material, the test results potentially showed substances used during a period of time that stretched farther back in the past than is the case with many such tests.

Ohio-1198 at ¶ 16. The juvenile court did not abuse its discretion.

{¶ 67} The fifth assignment of error is overruled.

### D. Child Support

{¶ 68} Mother's Assignment of Error No. 4 states:

{¶ 69} THE TRIAL COURT ERRED IN DENYING MOTHER'S MOTION TO MODIFY CHILD SUPPORT.

{¶ 70} Mother contends that the juvenile court overruled her motion to modify child support without ever addressing it. She argues that, even if the custody modification is affirmed, Father's child-support obligation should have been increased at the time her motion was filed in March 2019. The juvenile court, Mother says, should have ordered a retroactive increase in Father's support obligation for the over two-and-a-half-year period between the date Mother's motion was filed and the date the order giving Father legal custody was entered in November 2021.

{¶ 71} In the custody decision, the magistrate terminated Father's child-support obligation and imposed a support obligation on Mother. The magistrate's child-support worksheet (attached to the custody decision) was based on a worksheet jointly submitted by the parties. The magistrate included health-insurance expenses in the calculation but not childcare expenses, explaining that "the cost of child care was taken out as Mother will not incur daycare and no information regarding Father having daycare was provided." The worksheet calculations show that if Father had been ordered to pay support instead of Mother, the amount would have been higher than what he had been paying before winning custody. The juvenile court did not discuss Mother's objection regarding child support, saying simply that the magistrate's child-support orders would stand.

{¶ 72} A few things stand out here. First, Mother's original motion to modify child support requested modification based on her claim that the amount she was paying for

Jonathan's health insurance and childcare were not included in the child-support calculation.  Her objection to the custody decision, though, added another basis, referring to evidence showing each parent's "accurate income[]."

{¶ 73} More importantly, though, Mother does not explain precisely *why* there should have been an increase in Father's support obligation beginning in March 2019.  The information in the worksheet can be assumed valid only as of the worksheet date, November 15, 2021.  Mother cites no evidence, or reason to think, that the worksheet information was also valid over two-and-a-half years earlier, when Mother filed her motion for a modification.  While her argument vaguely suggests that such evidence was submitted, Mother does not identify where it is in the record.  We decline to do Mother's legwork for her by searching for the evidence in the voluminous record before us.

{¶ 74} "Matters involving child support are reviewed under an abuse-of-discretion standard."  (Citation omitted.) *Morrow v. Becker*, 138 Ohio St.3d 11, 2013-Ohio-4542, ¶ 9.  We find no abuse of discretion as to this matter.

{¶ 75} The fourth assignment of error is overruled.

### III. Conclusion

{¶ 76} We do not underestimate nor are we indifferent to the many nuances in this complex case.  But Mother fails to convince us that the juvenile court erred in its decision to grant Father's motion to change custody.  Having overruled all the assignments of error presented, the trial court's judgment is affirmed.

PIPER, P.J., and HENDRICKSON, J., concur.